M. S. Millikin, et al. [1] v. Commissioner. Millikin v. Commissioner
Docket Nos. 45050-45052.
United States Tax Court
T.C. Memo 1959-210; 1959 Tax Ct. Memo LEXIS 38; 18 T.C.M. (CCH) 995; T.C.M. (RIA) 59210; October 30, 1959
*38 Respondent's determination of income by increase in net worth plus nondeductible expenditures method approved with adjustments in accordance with the proof. Additions to tax under section 293(b), Internal Revenue Code of 1939 approved as to all years except 1949. Additions to tax for 1950 under sections 294(d)(1)(A) and 294(d)(2), I.R.C. 1939 approved. Held, that the statute of limitations does not bar assessment and collection of the tax liabilities. Held, further, that respondent failed to meet his burden of proving that the petitioner Dorothy P. Millikin is liable, as transferee of assets of her husband, for his tax liabilities for the years in question. Charles Oliphant, Esq., and Kenneth D. Thomas, Esq., for the petitioners. Raymond Whiteaker, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax and additions to tax against petitioners as follows: Additions to Tax Sec. 294 Sec. 294
Petitioner
Dk. No.
Year
Income Tax
Sec. 293(b)
(d)(1)(A) (d)(2)
M. S. Millikin
45051
1945
$ 9,690.23
$ 4,845.12
1946
27,297.82
13,648.91
1947
22,570.03
11,285.01
1948
5,893.61
2,946.81
1949
4,692.67
2,346.34
M. S. Millikin &
Doro-
thy P. Millikin
45052
1950
6,904.60
3,452.30
$1,202.49
By *39 amended answers in the above dockets the respondent made claim for increases in deficiencies in tax and additions to tax for the years 1945, 1947 and 1948 as follows: Increase in Addi-
tions to Tax
Increase in
under Sec.
Year
Deficiencies
293(b)
1945
$ 912.25
$ 456.12
1947
2,195.33
1,097.67
1948
1,889.20
944.60 and conceded that the deficiencies and additions to tax determined by him for the years 1946 and 1949 were excessive to the following extent: Excess in Addi-
tions to Tax
Excess in De-
under Sec.
Year
ficiencies
293(b)
1946
$1,816.21
$ 908.10
1949
2,902.84
1,451.43
In Docket No. 45050, liability at law and in equity is asserted against the petitioner Dorothy P. Millikin, as transferee of assets of M. S. Millikin, for the deficiencies and additions determined against him for the years 1945 through 1949, plus interest. The principal issue for the years 1945 to 1949 is whether the petitioner M. S. Millikin, and for the year 1950 the two petitioners, failed to report all their income, and, if so, whether any part of each deficiency in tax was due to fraud with intent to evade tax. Other issues relate to whether assessment and collection of any deficiencies or additions for the years 1945, 1946, 1947 and 1948 *40 are barred by the statute of limitations, whether the petitioners are liable for additions to tax for 1950 for failure to file a declaration of estimated tax and for substantial underestimation of estimated tax, and whether the petitioner Dorothy P. Millikin is liable, as transferee, for any deficiencies and additions to tax due from M. S. Millikin for the years 1945 to 1949. Findings of Fact Some of the facts were stipulated at the hearing and are incorporated herein by this reference. The petitioners are husband and wife. The petitioner M. S. Millikin timely filed Federal income tax returns for the years 1945 to 1949, inclusive, with the collector of internal revenue at Greensboro, North Carolina. The petitioners filed, on April 16, 1951, a joint income tax return for the year 1950 with the same collector. Dorothy P. Millikin is a party hereto by reason of having filed with her husband a joint return for the year 1950, and also because the respondent determined that she is liable, as a transferee of assets of her husband, for any deficiencies in tax or additions thereto for the years 1945 to 1949, inclusive. Hereinafter M. S. Millikin will be referred to as the petitioner. The petitioner *41 finished the ninth grade in school. He married the petitioner Dorothy P. Millikin in 1925 at the age of 20. After his marriage petitioner went into the dry cleaning business in Hamlet, North Carolina. He occasionally worked as a part-time railroad brakeman, making a few trips a month. He received pay from the railroad aggregating $589.70 in 1926; $364.05 in 1927; $198.87 in 1928; $343.51 in 1929; $189.98 in 1930; and $69.96 in 1931. He remained in the dry cleaning business until 1932, when he sold out because of the decrease in dry cleaning prices. Petitioner thereafter moved to Hickory, North Carolina, and was employed as assistant manager of a chain store at a salary of $12 to $15 per week until the company soon thereafter went into receivership. In 1933 or 1934 the petitioner Dorothy P. Millikin began the operation of a beauty salon in Hickory, North Carolina. The last date on which she bought equipment of any substantial value for the shop was in 1942 or 1943. It was a going business on January 1, 1945. She sold this business on March 14, 1946 for $3,750 in cash. In 1933 the petitioner organized the Millikin Music Company in Hickory, North Carolina, which business, except for *42 an interruption referred to below, he continued to operate through the years including the years in issue. This was a coin machine business, which consisted principally of placing coin operated phonographs and pinball machines owned by petitioner at locations owned or controlled by others under agreements, generally oral, whereby the receipts of the coin operated machines would be divided between petitioner and the proprietor of the premises, usually upon a 50-50 basis. This division was made in the presence of each other or their representatives. A collection report was made out at each time of division, recording the date, location, total amount, and the division. At some time prior to World War II the petitioner and another operated a flying school at Beacon Field, Hickory, North Carolina. He and his partner owned four airplanes at different times, the petitioner having a one-half interest therein. At some time not disclosed by the record this business ceased because the partner went into military service and because it was not a financial success. On September 6, 1941, petitioner sold assets of his music business, consisting of 47 coin operated machines, some related equipment, *43 one 1941 Chevrolet 1/2 ton pickup truck, and one typewriter, to Pete Kovachi, for which Kovachi paid petitioner $2,500 in cash and assumed the balance of the payments due on the equipment totaling $8,317.77. Thereafter petitioner moved to Georgia, where he purchased a coin machine business, paying $5,000 down and agreeing to pay $700 per week until an undisclosed balance was paid. Some phases of the operation were illegal in Georgia, it appeared likely that the authorities would close down the business, and the volume of business decreased. Therefore, the petitioner had difficulty keeping up his payments and in 1942 turned the business back to the seller, receiving about $2,500 in final settlement. The petitioner then returned to North Carolina and reacquired his old coin machine business from Kovachi by paying him $3,600 on March 25, 1942, and assuming an indebtedness of $4,389.51. Kovachi had not been able to make money out of the business. After petitioner returned to North Carolina he resumed work in October 1942 as a railroad brakeman. He continued this through April 1943 earning an average of about $265 per month for those 7 months. Sometime in 1943 petitioner transferred some *44 of his music and pinball operations to Camp McCall, North Carolina, placing some of his machines in officers' and enlisted men's clubs at that post. His operations at Camp McCall continued for about a year and a half and until at least January 1, 1945, he owning the coin operated phonographs and pinball machines and splitting the gross receipts from those with the clubs on a 50-50 basis. At some time in this period he bought some slot machines and furniture for the clubs at Camp McCall under an arrangement by which a percentage of the receipts from the machines was to be paid to him in payment of an undisclosed price for the machines. Under agreement the petitioner also kept the machines in working condition in consideration of either a percentage of the collections or a flat fee, depending upon the particular club involved. The operation of slot machines was illegal in North Carolina, but it was common practice to place them in fraternal club rooms and at army camps. The petitioner filed no Federal income tax returns prior to 1940, nor did he file one for 1942. For the taxable years 1940 and 1941 he filed returns, but showed no tax due. For 1943 and 1944 he filed returns showing taxes *45 due in the amounts of $1,362.91 and $858.53, respectively. The petitioner in his returns for 1945 to 1949, inclusive (and the two petitioners in their joint return for 1950), showed the following gross profit from businesses, net rental income, other income, net income and tax liabilities: 1945
1946
1947
Music Co.
$1,675.35
$13,557.07
$6,486.67
Hamlet Self-Service Laun-
dry
(853.72)
Rockingham Self-Service
Laundry
(1,689.57)
Net Rentals
185.64
(532.07)
Capital Gain
425.00
Dixie Novelty Co.
Profit from Sale of Non-
Capital Asset
Joint Venture Ashland
Oil Co.
Net Income from all
Sources
$1,675.35 *
$13,242.71
$3,763.21
Tax Liability
34.00
2,956.62
335.01
1948
1949
1950
Music Co.
[2,673.09)
$5,840.54
$6,975.93
Hamlet Self-Service Laun-
dry
(1,291.60)
(163.91)
(2,047.67)
Rockingham Self-Service
Laundry
(2,608.83)
(2,428.23)
None
Net Rentals
(635.96)
1,326.38
925.05
Capital Gain
Dixie Novelty Co.
328.02
(1,299.40)
Profit from Sale of Non-
Capital Asset
150.00
Joint Venture Ashland
Oil Co.
111.12
Net Income from all
Sources
[7,320.01)
$3,012.31
$5,283.32
Tax Liability
None
101.64
712.68
All the foregoing returns were prepared by a firm of certified public accountants from information furnished by the petitioners *46 which the firm did not verify by audit. Petitioner Dorothy P. Millikin filed an income tax return for the year 1945, showing profit from the operation of a beauty salon in the amount of $594.73, and no tax due. She filed no Federal income tax returns for the years 1947, 1948, 1949, 1951, and 1952. An investigation of the petitioners' income tax returns for the years 1945 to 1950, inclusive, was commenced by the respondent on February 11, 1952. A revenue agent spent a total of about 5 1/2 months of working days (20 days per month) in the investigation. A special agent assisted and worked about 5 months. The agent visited the Millikin residence and the petitioner Dorothy P. Millikin permitted him to briefly leaf through some canceled checks for the years 1946, 1947, and later years and a journal and a ledger for the years 1949 and 1950. At that time the agent questioned the petitioner concerning cash on hand and gifts and inheritances. Petitioner declined to answer concerning cash, but stated that he had not received any gifts or inheritances. Thereafter the agent was permitted to analyze bank statements and canceled checks relating to three business bank accounts for the years 1948, *47 1949 and 1950, namely, those of the Millikin Music Company and the self-service laundries in Rockingham and Hamlet. The agent requested the canceled checks on several other accounts in the names of petitioners and members of the family, but was refused permission to see them on the ground that they were personal. Except for the brief examination of checks at the time of the revenue agent's first visit, the agents were never permitted to examine bank statements and canceled checks or other records for the years 1945, 1946 and 1947. Because of the refusal of the petitioners to produce certain records and because such records as they saw were inadequate, the agents concluded that it was necessary to determine the petitioners' taxable income by the increase in net worth method. In the course of their investigation the agents followed all leads given to them by the petitioners and by any third parties. Intangible property tax returns were filed with the State of North Carolina in which the petitioner declared under oath on March 13, 1948 and March 18, 1949, that he had no cash on hand as of the end of the years 1947 and 1948. A financial statement dated May 2, 1949, on file with a bank *48 in Rockingham, North Carolina, signed by the petitioner, shows a net worth of $153,837.10 as of that date. As a result of the investigation of the agents, the respondent, in determining the deficiencies, computed the income of the petitioner for the years 1945 to 1949, inclusive, and of both petitioners for the year 1950 upon the net worth plus nondeductible expenditures method. His computation was as follows: 1/1/45
12/31/45
12/31/46
12/31/47
ASSETS: Cash on Hand
0
0
0
0
Bank Accounts
$ 1,652.91
$ 1,648.48
$ 3,274.45
$ 10,512.86
Stocks
0
0
0
0
Bonds
1,275.00
13,706.25
26,606.25
37,856.25
Investments Including
Partnership Interests
0
0
4,000.00
3,521.19
Receivables
0
0
10,000.00
700.00
Amusement Equipment
0
0
15,893.98
19,644.20
Laundry Equipment
0
0
0
13,562.45
Automobiles and Trucks
1,520.00
1,520.00
1,520.00
5,650.46
Furniture and Fixtures
279.83
279.83
279.83
414.83
Real Estate
6,750.00
8,000.00
8,000.00
17,500.00
Other Assets (Goodwill
at cost)
0
0
0
0
Total Assets
$11,477.74
$25,154.56
$69,574.51
$109,362.24
LIABILITIES AND RE-
SERVES FOR DE-
PRECIATION: Notes and Accounts Pay-
able
$ 4,230.09
$ 2,515.34
$ 1,908.38
$ 12,517.18
Reserves for Deprecia-
tion: Amusement
Equipment
0
0
1,588.60
5,140.76
Laundry
Equipment
0
0
0
616.93
Automobiles and
Trucks
700.00
905.00
1,110.00
700.00
Furniture and
Fixtures
83.94
111.92
139.90
174.63
Rental Properties
0
0
106.25
273.33
Total Liabilities and
Reserves for Depreci-
ation
$ 5,014.03
$ 3,532.26
$ 4,853.13
$ 19,422.83
Net Worth
6,463.71
21,622.30
64,721.38
89,939.41
Increase in Net Worth
$15,158.59
$43,099.08
$ 25,218.03
*49 12/31/48
12/31/49
12/31/50
ASSETS: Cash on Hand
$ 3,500.00
0
$ 1,788.00
Bank Accounts
2,232.32
$ 1,873.03
3,074.58
Stocks
4,000.00
4,000.00
8,800.00
Bonds
37,856.25
4,106.25
4,106.25
Investments Including
Partnership Interests
3,749.21
1,425.72
7,103.97
Receivables
12,400.00
5,900.00
9,400.00
Amusement Equipment
24,998.90
55,144.23
75,239.84
Laundry Equipment
13,855.48
13,855.48
13,855.48
Automobiles and Trucks
7,534.87
9,004.37
10,318.03
Furniture and Fixtures
414.83
414.83
414.83
Real Estate
51,400.00
55,389.04
55,627.27
Other Assets (Goodwill
at cost)
0
968.13
968.13
Total Assets
$161,941.86
$152,081.08
$190,696.38
LIABILITIES AND RE-
SERVES FOR DE-
PRECIATION: Notes and Accounts Pay-
able
$ 42,171.91
$ 27,338.67
$ 34,419.63
Reserves for Deprecia-
tion: Amusement
Equipment
9,816.24
17,524.55
30,332.77
Laundry
Equipment
2,891.80
4,910.32
6,658.50
Automobiles and
Trucks
129.21
571.32
694.43
Furniture and
Fixtures
216.11
257.59
299.07
Rental Properties
922.91
1,872.49
2,822.07
Total Liabilities and
Reserves for Depreci-
ation
$ 56,148.18
$ 52,474.94
$ 75,226.47
Net Worth
105,793.68
99,606.14
115,469.91
Increase in Net Worth
$ 15,854.27
[6,187.54)
$ 15,863.77
1945
1946
1947
1948
1949
1950
Increase in
$15,158.59
$43,099.08
$25,218.03
$15,854.27
[6,187.54)
$15,863.77
Net Worth
Add: Personal
Life
Insurance
Pre-
miums Paid
240.00
1,102.90
1,102.90
1,102.90
1,699.60
2,430.00
During Year
Federal
Income Tax
Pay-
ments and
548.47
9.94
5,456.62
(1,164.99)
(1,000.00)
101.64
(Refunds)
Personal
Non-
deductible
Liv-
ing
10,079.52
14,037.88
19,522.20
9,432.96
17,560.92
8,118.66
Expenses
Non-
deductible
Losses on
Trades of
Personal
Auto-
mobiles
0
0
490.90
0
0
1,903.50
Total
$10,867.99
$15,150.72
$26,081.72
$ 9,370.87
$18,260.52
$10,650.30
Total
Increase in
Net Worth
and
Non-
deductible
Personal
Ex-
penses
$26,026.58
$58,249.80
$51,790.65
$25,225.14
$12,072.88
$28,417.57
Less: Long Term
Capital
Gains at
100%
0
4,000.00
542.50
0
2,098.13
0
Net
Ordinary
Income for
Tax
Computation
$26,026.58
$54,249.80
$51,248.15
$25,225.14
$ 9,974.85
$28,417.57
Net Capital
0
2,000.00
271.25
0
1,049.07
0
Gains
Net Income
$26,026.58
$56,249.80
$51,519.40
$25,225.14
$11,023.92
$28,417.57
for Tax
Computation
Cash *50 on Hand The petitioner had cash on hand at January 1, 1945, and at the end of the years 1945 to 1949, inclusive, and the two petitioners had cash on hand at the beginning and end of 1950, as follows: 1/ 1/45
$6,000
12/13/45
6,000
12/31/46
6,000
12/31/47
0
12/31/48
3,500
12/31/49
0
1/ 1/50
0
12/31/50
1,788
Cash in Banks The petitioner and members of his family had the following amounts in bank accounts as of the end of each of the years in question: Joint
Accts.
Accts. M.S.
of M.S.
Millikin and
Joint Accts.
Acct. of
Millikin or
Dorothy
M. S. Millikin
Dorothy
Accts. of
Date
His Businesses
P. Millikin
and Daughters
P.
Daughters
Millikin
P. Millikin
Daughters
1/ 1/45
$ 602.32
$1,050.5
9
12/31/45
577.91
1,070.57
12/31/46
2,132.67
1,140.40
$1.38
12/31/47
2,743.43
$2,201.95
$4,403.90
1,161.25
2.33
12/31/48
894.47
1,335.42
2.43
12/31/49
633.54
1,239.50
12/31/50
1,246.41
400.00
1,428.17
The amounts of cash in banks to be included in the net worth of the petitioner as of January 1, 1945 and at the end of each of the years 1945 to 1949, inclusive, and of both petitioners at the beginning and end of 1950 are as follows: 1/ 1/45
$ 602.32
12/31/45
577.91
12/31/46
2,132.67
12/31/47
9,349.28
12/31/48
894.47
12/31/49
633.54
1/ 1/50
1,873.04
12/31/50
3,074.58
Stocks At January *51 1, 1945 and at the end of each of the years 1945 to 1950, inclusive, the petitioner had corporate stock which had cost the following amounts: 1/ 1/45
0
12/31/45
0
12/31/46
0
12/31/47
0
12/31/48
$4,000
12/31/49
4,000
12/31/50
4,000
The petitioner invested $4,800 in stock of Cotton Products, Inc., but this investment was not made until 1951. Receivables (Loans) The petitioner had receivables (loans) as follows: 1/ 1/45
0
12/31/45
0
12/31/46
$ 9,600
12/31/47
700
12/31/48
12,400
12/31/49
5,900
12/31/50
2,400
The petitioner had a loan receivable from Max Sawitz, but it became an asset of the petitioner in 1951 instead of 1950. United States Savings Bonds Over the period from March 1942 through December 1944, there were purchased $1,700 face amount of United States Savings Bonds, some in the joint names of the two petitioners, some in the name of the petitioner Dorothy P. Millikin, and some in the joint names of the petitioner Dorothy P. Millikin and her daughters. The total face amount of bonds of which the petitioner was a joint owner amounted to $175, which had cost $131.25. These bonds were on hand at January 1, 1945, and at the end of each of the years 1945, 1946, 1947, and 1948. During the year 1945 the petitioner *52 purchased a total of $16,575 face value United States Savings Bonds in the joint names of the two petitioners, in the joint names of petitioner or his daughters, and in the joint names of the petitioner Dorothy P. Millikin and the daughters. These bonds had cost $12,431.25 and were on hand as of the end of each of the years 1945, 1946, 1947, and 1948. The great bulk of these bonds, $15,000 face value, was purchased in July 1945. During 1946 the petitioner purchased United States Savings Bonds in the face amount of $17,200, which had cost $12,900, in the joint names of the two petitioners, in the joint names of the petitioner or his daughters, and in the joint names of the petitioner Dorothy P. Millikin and the daughters. The bulk of these bonds, $15,000 face value, was purchased in February 1946. All these bonds were on hand as of the end of each of the years 1946, 1947, and 1948. In November 1947, the petitioner purchased $15,000 face amount of United States Savings Bonds, which had cost $11,250, in the joint names of the two petitioners and the joint names of the petitioner and his daughters. These bonds were on hand as of the end of 1947 and 1948. There were no bond purchases in *53 1948, 1949, and 1950. As of the end of 1949 and 1950 there were bonds on hand which had cost $4,106.25. The costs of bonds to be included in the net worth of the petitioner as of the beginning of the year 1945 and at the end of each of the years 1945 to 1949, inclusive, and of both petitioners at the beginning and end of 1950, are as follows: 1/ 1/45
$ 131.25
12/31/45
12,562.50
12/31/46
26,462.50
12/31/47
36,737.50
12/31/48
36,737.50
12/31/49
4,106.25
1/ 1/50
4,106.25
12/31/50
4,106.25 Investments Including Partnership Interests The petitioner had an investment in Dixie Novelty Company, Hickory, North Carolina, a partnership, in the amounts of $4,000 as of December 31, 1946, $3,521.19 as of December 31, 1947, and $3,749.21 as of December 31, 1948. This partnership was dissolved September 14, 1949. In 1950 the petitioner invested $3,256 in Sidney's Grill, Rockingham, North Carolina, and owned this investment as of the end of 1950. This business was in the hands of a receiver as of the end of 1950. In 1949 petitioner invested $1,425.72 in a number of oil leases covering property in Kentucky, Illinois, and Indiana, which investments he owned at the end of 1949 and 1950. In 1950 he invested in other *54 oil leases the amount of $2,422.25. Consequently as of the end of 1950 his investment in oil leases amounted to $3,847.97. On property covered by one lease (the Tinsley lease) a dry hole was drilled in 1949 and another in 1950. On property covered by three other leases (namely, South Oatsville, B. H. Howard, and White County leases) dry holes were drilled in 1950. As a consequence, the leases had no further value and the group which owned the leases abandoned those leases in 1950. The petitioner's investment in these four leases amounted to $2,097.42. His investment to this extent constituted a loss in 1950. The petitioner's investments, including partnership interests, as of the beginning of 1945 and at the end of each of the years 1945 to 1950, inclusive, were as follows: 1/ 1/45
0
12/31/45
0
12/31/46
$4,000.00
12/31/47
3,521.19
12/31/48
3,749.21
12/31/49
1,425.72
12/31/50
5,006.55
Amusement Equipment The petitioner continued his coin operated amusement machine business known as the Millikin Music Company throughout the years in question. The machines owned consisted principally of coin operated phonographs, pinball machines, and certain vending machines, which were located in various places, *55 such as army camp clubs, private clubs, restaurants, and other places of business. As indicated hereinabove, some operations were carried on at Camp McCall, North Carolina, from 1943 until sometime after January 1, 1945. Thereafter, at a time not disclosed, that portion of the operations was transferred to Fort Bragg, North Carolina. In 1946 the petitioner purchased 102 pieces of amusement equipment at a total cost of $15,893.98. These consisted generally of phonographs and pinball machines. However, two of such items which had cost a total of $714.50 were traded in that year and were not on hand at the end of the year. Included in the purchases in 1946 were 12 slot machines (gambling devices) at a cost of $5,008.68. In the late summer or early fall of 1946 Army officers in charge of the recreational facilities at Fort Bragg purchased from the petitioner for army clubs 12 second-hand slot machines, payment to be made out of a portion of the proceeds from the operation of the machines. These machines were not satisfactory and negotiations were had with petitioner to have the old machines traded in for new machines. The 12 slot machines above referred to were acquired by the petitioner *56 pursuant to this request of the Fort Bragg authorities and did not belong to the petitioner at December 31, 1946. At December 31, 1946, the petitioner owned coin operated amusement equipment which had cost $10,170.80. During 1947 the petitioner purchased more amusement equipment. Included was a slot machine purchased in February at a cost of $1,500, which was either purchased for, or was sold by petitioner to, Fort Bragg army clubs. During that year machines previously purchased at a cost of $2,158.50 were traded for new equipment. As of December 31, 1947, petitioner had on hand amusement equipment which had cost $10,977.02. During 1948 the petitioner continued to purchase additional amusement equipment. Included were 50 vending machines at a cost of $787.96, which the petitioner purchased for another person. Delivery was refused by the other party and the petitioner immediately returned the machines to the seller. There were also purchased by the petitioner and R. E. McDaniel in July or August 1948, 100 vending machines at a cost of $1,295 on a conditional sales contract, $295 being paid down. This venture proved to be unprofitable, the machines were sold in 1949 and the proceeds *57 were used to pay off the remaining balance. These machines had been included by the respondent at a cost of $1,030. The amount to be included in the computation for cost of amusement equipment on hand as of December 31, 1948, is $14,513.76. The petitioner continued to purchase additional amusement equipment in 1949. In that year music machines previously acquired at a cost of $3,249.35 were disposed of. As of December 31, 1949, the petitioner had amusement equipment which had cost $42,377.87. During 1950 the petitioner bought additional amusement equipment. Included were 8 slot machines which had cost $2,410.24 which the petitioner sold in that year to two VFW posts and a country club. The petitioner had on hand at December 31, 1950, amusement equipment which had cost $60,063.24. Laundry Equipment The petitioner had laundry equipment at the following costs: 1/ 1/45
0
12/31/45
0
12/31/46
0
12/31/47
$13,562.45
12/31/48
13,855.48
12/31/49
13,855.48
12/31/50
13,855.48
Automobiles and Trucks The petitioner had automobiles and trucks at the following costs: Cost or Basis - Automobiles and Trucks
1945-1950
Date
acq'd
1/1/45
12/31/45
12/31/46
1942 Oldsmobile
10/41
$1,604.28
$1,604.28
$1,604.28
1941 Chev. Truck
1/41
700.00
700.00
700.00
1941 Ford Cpe.
12/44
820.00
820.00
820.00
1946 Willys Jeep
2/47
1947 Olds. Conv.
9/47 Chev. 11948/2 Ton Pick-Up
2/48
1948 Buick Conv.
5/48
1948 Chev. DeL Town Sed.
8/48
1937 Plymouth
9/48 Chev. 11948/2 Ton Pick-Up
5/49
1950 Buick Sedan
4/50
1950 Ford Sedan
8/50
1950 Ford Truck
10/50
1951 Ford Custom
12/50
Totals - Cost or Basis
$3,124.28
$3,124.28
$3,124.28
Cost or Basis - Automobiles and Trucks
1945-1950
12/31/47
12/31/48
12/31/49
12/31/50
1942 Oldsmobile
1941 Chev. Truck
$ 700.00
1941 Ford Cpe.
1946 Willys Jeep
1947 Olds. Conv.
3,203.50
$3,203.50
$3,203.50 Chev. 11948/2 Ton Pick-Up
1,033.68
1,033.68
1948 Buick Conv.
2,922.69
2,922.69
$ 2,922.69
1948 Chev. DeL Town Sed.
1937 Plymouth
375.00
375.00
375.00 Chev. 11948/2 Ton Pick-Up
1,469.50
1,469.50
1950 Buick Sedan
2,603.56
1950 Ford Sedan
2,220.99
1950 Ford Truck
1,146.84
1951 Ford Custom
2,502.14
Totals - Cost or Basis
$3,903.50
$7,534.87
$9,004.37
$13,240.72
*58 Furniture and Fixtures The petitioner had furniture and fixtures at the following costs on the following dates: 1/ 1/45
$279.83
12/31/45
279.83
12/31/46
279.83
12/31/47
414.83
12/31/48
414.83
12/31/49
414.83
12/31/50
414.83
Real Estate The following tabulation shows the cost of real estate owned by the petitioner at January 1, 1945, and at the end of each of the years 1945 to 1949, inclusive, and by both petitioners at January 1, 1950, and December 31, 1950: Summary of Real Estate (Cost or Basis)
1/1/45
12/31/45
12/31/46
12/31/47
Residence - 208
Rockingham Road
Rockingham, N.C.
0
0
0
0
Former Residence
Hickory, N.C.
10th St. (Brown)
$6,750.00
$6,750.00
$6,750.00
$ 6,750.00
House and Lot
Hickory (Hollar)
16th St.
0
0
0
9,300.00
House and Lot
Hickory (Lutz)
14th St.
0
0
0
0
Apartment
Hickory (Keever)
8th St. & 10th Ave.
0
0
0
0
TOTAL
$6,750.00
$6,750.00
$6,750.00
$16,050.00
Summary of Real Estate (Cost or Basis)
12/31/48
12/31/49
1/1/50
12/31/50
Residence - 208
Rockingham Road
Rockingham, N.C.
0
0
$18,011.77
$18,250.00
Former Residence
Hickory, N.C.
10th St. (Brown)
$ 6,750.00
$ 6,750.00
6,750.00
6,750.00
House and Lot
Hickory (Hollar)
16th St.
9,300.00
9,300.00
9,300.00
9,300.00
House and Lot
Hickory (Lutz)
14th St.
11,500.00
11,500.00
11,500.00
11,500.00
Apartment
Hickory (Keever)
8th St. & 10th Ave.
7,650.00
7,650.00
7,650.00
7,650.00
TOTAL
$35,200.00
$35,200.00
$53,211.77
$53,450.00
*59 The property at 208 Rockingham Road was purchased by the petitioner Dorothy P. Millikin on November 24, 1948. She paid $4,750 from her own funds. The balance of $10,000 was paid out of a loan in the amount obtained from a building and loan association for which both petitioners signed a note and a deed of trust. This property was used as the residence of the petitioners. The $10,000 loan was repayable with interest at six per cent in monthly installments of $150, payable the first of each month, commencing December 1, 1948. The monthly payments in each of the years 1948, 1949 and 1950 were made by the petitioner, amounting to $300 in 1948, $1,650 in 1949, and $1,800 in 1950. The principal amount of the mortgage was $9,749.25 at December 31, 1948, $8,657.95 at December 31, 1949, and $7,341.62 at December 31, 1950. Improvements were made to the residence at 208 Rockingham Road in 1949 at a cost to the petitioner of $3,261.77 and in 1950 at a cost to him of $238.23. These additional costs are reflected in the above tabulation of cost of assets on hand at January 1 and December 31, 1950. Notes and Accounts Payable The petitioner had notes and accounts payable as of January 1, 1945 and *60 at the end of each of the years 1945 to 1949, inclusive, and both petitioners had notes and accounts payable as of the beginning and end of 1950 as follows: 1/ 1/45
$ 4,015.88
12/31/45
2,301.13
12/31/46
1,694.17
12/31/47
$12,517.18
12/31/48
32,422.66
12/31/49
18,680.72
1/ 1/50
27,338.67
12/31/50
34,419.63
Reserves for Depreciation Amusement Equipment. The proper reserve for depreciation on amusement equipment as of the beginning of 1945 and as of the end of each of the years 1945 to 1950, inclusive, is as follows: 1/ 1/45
0
12/31/45
0
12/31/46
$ 1,517.15
12/31/47
4,343.21
12/31/48
8,105.19
12/31/49
12,650.82
12/31/50
23,669.11 Laundry Equipment. The reserve for depreciation of laundry equipment is: 1/ 1/45
0
12/31/45
0
12/31/46
0
12/31/47
$ 616.93
12/31/48
2,891.80
12/31/49
4,910.32
12/31/50
6,658.50 Automobiles and Trucks. The reserve for depreciation of automobiles and trucks is as follows: 1/ 1/45
$ 700.00
12/31/45
905.00
12/31/46
1,110.00
12/31/47
700.00
12/31/48
129.21
12/31/49
571.32
12/31/50
694.43 Furniture and Fixtures. The reserve for depreciation of furniture and fixtures is as follows: 1/ 1/45
$ 83.94
12/31/45
111.92
12/31/46
139.90
12/31/47
174.63
12/31/48
216.11
12/31/49
257.59
12/31/50
299.07 Rental Property. The respondent in his *61 computation of taxable income by the net worth method included reserve for depreciation on rental property as follows: Cost
Est.
Reserve for Depreciation
Alloc.
Property
To Imp.
Life
12/31/46
12/31/47
12/31/48
12/31/49
12/31/50
Former
Residence,
10th
St., Hickory
- Cost $6,750
- Converted
to rental
use 1946
$4,250
40 yrs.
$106.25
$212.50
$318.75
$ 425.00
$ 531.25
Hollar House,
16th St.,
Hickory -
Cost $9,300 -
Acquired
7,300
30 yrs.
60.83
304.16
547.49
790.82
10-2-47
Apartment,
14th St.,
Hick-
ory - Cost
$11,500 - Ac-
quired
9,000
25 yrs.
180.00
540.00
900.00
7-10-48
Apartment,
8th St.,
Hick-
ory - Cost
$7,650 - Ac-
quired 7-9-48
6,000
25 yrs.
120.00
360.00
600.00
Totals
$106.25
$273.33
$922.91
$1,872.49
$2,822.07
The former residence in Hickory is a two-story brick veneer house located on a lot of 75inch or 100inch frontage. The year of construction is not disclosed. In their returns the petitioners took depreciation on a basis (apparently the claimed value at date of conversion to rental use) of $15,000 and an estimated life of 30 years. The property on 16th Street in Hickory (Hollar House) is a two-story frame building and garage, located on a lot 60inch X 75inch. In 1947 the house was about 14 years old. In their returns the petitioners took depreciation *62 on a basis of $9,300 and an estimated life of 20 years. The apartment on 14th Street in Hickory is a two-story frame building converted into two apartments. In 1948 this building was about 25 years old. In their returns the petitioners took depreciation on the basis of $10,000 and an estimated life of 20 years. The apartment on 8th Street in Hickory is a large frame house converted into three apartments. In 1948 this building was about 15 years old. In their returns the petitioners took depreciation on a basis of $7,000 and an estimated life of 15 years. The correct reserves for depreciation of rental properties are those determined by the respondent. Personal Life Insurance Premiums Paid During Year During the years 1945 to 1950 the petitioner paid the following amounts of premiums on personal life insurance: Year
Amount
1945
$ 240.00
1946
1,102.90
1947
1,102.90
1948
1,102.90
1949
1,699.60
1950
2,430.00
Federal Income Tax Payments and (Refunds) During the years in question the petitioner made net payments of Federal income taxes or received (net refunds) as follows: Year
Amount
1945
$ 548.47
1946
9.94
1947
5,456.62
1948
(1,164.99)
1949
(1,000.00)
1950
101.64
Personal Non-Deductible Living Expenses During *63 the years in question the petitioners lived at Rockingham, North Carolina. From 1945 to 1948 they lived in an apartment which cost them $49.50 per month, including water. In 1949 they moved into a residence located at 208 Rockingham Road, which had cost $14,750. Some new furniture, in an undisclosed amount, was purchased at that time, but in the main the house was furnished with old furniture which they had owned for many years. During the years in question the petitioners had two daughters. During that period both of them attended high school, one of them attended college for a year or two, and one attended college for a period of about a month or six weeks. Both daughters attended a business school in Raleigh for an undisclosed number of months in 1948 and 1949. Room and board for both was $92 per month. One of the daughters was married in 1950. During the years in question, or some of them, the petitioner belonged to a country club and belonged to the Elks Club at Southern Pines, North Carolina. During the years 1949 and 1950 the petitioners employed a part-time maid. The petitioner did not always eat his meals at home, but Dorothy P. Millikin and their daughters did. The petitioners *64 would occasionally go out to the country club during the evenings or would eat dinner at a restaurant. During the years 1945 and 1946 the petitioners had an automobile and in the later years in question they had two or more. In determining the amount of non-deductible personal and living expenses, the respondent included the amounts of numerous checks which had been drawn on the bank accounts of the self-service laundries and the Millikin Music Company in the years 1948, 1949, and 1950, amounting to $2,183.54 in 1948, $1,383.03 in 1949, and $1,369.32 in 1950, and which the agents concluded after examination of the checks were personal. Also included were the amounts of numerous checks for each of the years in question drawn on bank accounts carried in the names of the petitioners, members of the family, and the businesses conducted, which the agents were unable to identify as to payee or reason for the payment, since they had access only to bank records which merely showed the amounts and dates of the checks. This involved 3 such bank accounts in 1945, 4 in 1946, 6 in 1947, 6 in 1948, 8 in 1949, and 4 in 1950. The total amounts of the unidentified checks which were classified as non-deductible *65 personal living expenses amounted to $10,079.52, $14,037.88, $19,522.20, $7,249.42, $16,177.89, and $3,826.65 for the years 1945 to 1950, respectively. The non-deductible personal and living expenses of the petitioner for the years 1945 to 1949 and for the petitioners for the year 1950 (aside from life insurance premiums and Federal income tax payments) amounted to $4,000 for each of the years 1945, 1946, and 1947, and $5,000, $9,000 and $5,000 for the years 1948, 1949, and 1950, respectively. Non-Deductible Losses on Trades of Personal Automobiles In the years 1947 and 1950 the petitioner had losses on trades of personal automobiles in the respective amounts of $490.90 and $1,903.50. Long-Term Capital Gains The petitioner had long-term capital gains of $4,000 in 1946, $542.50 in 1947, and $2,098.13 in 1949. Revised Net Worth Computation Giving effect to the foregoing findings, the correct computation of the net income by the increase in net worth plus non-deductible personal and living expenditures method is as follows: 1/1/45
12/31/45
12/31/46
12/31/47
Assets: Cash on hand
$ 6,000.00
$ 6,000.00
$ 6,000.00
0
Cash in banks
602.32
577.91
2,132.67
$ 9,349.28
Stocks
0
0
0
0
Receivables
0
0
9,600.00
700.00
Bonds
131.25
12,562.50
26,462.50
36,737.50
Investments including
partnership inter-
ests
0
0
4,000.00
3,521.19
Amusement equipment
10,170.80
10,977.02
Laundry equipment
0
0
0
13,562.45
Automobiles and trucks
3,124.28
3,124.28
3,124.28
3,903.50
Furniture and fixtures
279.83
279.83
279.83
414.83
Real estate
6,750.00
6,750.00
6,750.00
16,050.00
Total assets
$ 16,887.68
$ 29,294.52
$ 68,520.08
$ 95,215.77
Liabilities and Reserves
for Depreciation: Notes and accounts
$ 4,015.88
$ 2,301.13
$ 1,694.17
$ 12,517.18
payable
Reserves for
depreciation: Amusement equipment
0
0
1,517.15
4,343.21
Laundry equipment
0
0
0
616.93
Automobiles and trucks
700.00
905.00
1,110.00
700.00
Furniture and fixtures
83.94
111.92
139.90
174.63
Rental properties
106.25
273.33
Total liabilities and
reserves for depre-
ciation
$ 4,799.82
$ 3,318.05
$ 4,567.47
$ 18,625.28
Net worth
12,087.86
25,976.47
63,952.61
76,590.49
Increase in net worth
$ 13,888.61
$ 37,976.14
$ 12,637.88
*66 12/31/48
12/31/49
1/1/50
12/31/50
Assets: Cash on hand
$ 3,500.00
0
0
$ 1,788.00
Cash in banks
894.47
$ 633.54
$ 1,873.04
3,074.58
Stocks
4,000.00
4,000.00
4,000.00
4,000.00
Receivables
12,400.00
5,900.00
5,900.00
2,400.00
Bonds
36,737.50
4,106.25
4,106.25
4,106.25
Investments including
partnership inter-
ests
3,749.21
1,425.72
1,425.72
5,006.55
Amusement equipment
$ 14,513.76
$ 42,377.87
$ 42,377.87
$ 60,063.24
Laundry equipment
13,855.48
13,855.48
13,855.48
13,855.48
Automobiles and trucks
7,534.87
9,004.37
9,004.37
13,240.72
Furniture and fixtures
414.83
414.83
414.83
414.83
Real estate
35,200.00
35,200.00
53,211.77
53,450.00
Total assets
$132,800.12
$116,918.06
$136,169.33
$161,399.65
Liabilities and Reserves
for Depreciation: Notes and accounts
$ 32,422.66
$ 18,680.72
$ 27,338.67
$ 34,419.63
payable
Reserves for
depreciation: Amusement equipment
8,105.19
12,650.82
12,650.82
23,669.11
Laundry equipment
2,891.80
4,910.32
4,910.32
6,658.50
Automobiles and trucks
129.21
571.32
571.32
694.43
Furniture and fixtures
216.11
257.59
257.59
299.07
Rental properties
922.91
1,872.49
1,872.49
2,822.07
Total liabilities and
reserves for depre-
ciation
$ 44,687.88
$ 38,943.26
$ 47,601.21
$ 68,562.81
Net worth
88,112.24
77,974.80
88,568.12
92,836.84
Increase in net worth
$ 11,521.75
[10,137.44)
$ 4,268.72
*67 1945
1946
1947
Increase in Net Worth
$13,888.61
$37,976.14
$12,637.88
Add: Personal Life Insurance Pre-
miums Paid During Year
240.00
1,102.90
1,102.90
Federal Income Tax Pay-
ments and (Refunds)
548.47
9.94
5,456.62
Personal Non-Deductible Liv-
ing Expenses
4,000.00
4,000.00
4,000.00
Non-Deductible Losses on
Trades of Personal Auto-
mobiles
490.90
Total
$ 4,788.47
$ 5,112.84
$11,050.42
Total Increase in Net Worth
and Non-Deductible Per-
sonal Expenses
$18,677.08
$43,088.98
$23,688.30
Less: Long-term Capital Gains at
100%
0
4,000.00
542.50
Net Ordinary Income for Tax
Computation
$18,677.08
$39,088.98
$23,145.80
Net Capital Gains
0
2,000.00
271.25
Net Income
$18,677.08
$41,088.98
$23,417.05
1948
1949
1950
Increase in Net Worth
$11,521.75
[10,137.44)
$ 4,268.72
Add: Personal Life Insurance Pre-
miums Paid During Year
1,102.90
1,699.60
2,430.00
Federal Income Tax Pay-
ments and (Refunds)
(1,164.99)
(1,000.00)
101.64
Personal Non-Deductible Liv-
ing Expenses
5,000.00
9,000.00
5,000.00
Non-Deductible Losses on
Trades of Personal Auto-
mobiles
1,903.50
Total
$ 4,937.91
$ 9,699.60
$ 9,435.14
Total Increase in Net Worth
and Non-Deductible Per-
sonal Expenses
$16,459.66
$ (437.84)
$13,703.86
Less: Long-term Capital Gains at
100%
0
2,098.13
0
Net Ordinary Income for Tax
Computation
$16,459.66
$ (2,535.97)
$13,703.86
Net Capital Gains
0
1,049.07
0
Net Income
$16,459.66
$ (1,486.90)
$13,703.86
*68 Petitioner received no gifts or inheritances prior to or during the years involved in this proceeding. The petitioner was indicted on two counts in the United States District Court for the Middle District of North Carolina for willfully and knowingly attempting to defeat and evade his income taxes for the years 1947 and 1948 by filing false and fraudulent income tax returns for those years. Petitioner pleaded not guilty and was given a jury trial. He was convicted, setenced to prison for four years, and fined $15,000. His sentence was suspended, he was placed on probation for three years, and his fine was reduced to $10,000. The notices of deficiency in Docket Nos. 45051 and 45052, and notice of transferee liability in Docket No. 45050 were mailed by the respondent on August 4, 1952. On March 10, 1952 the petitioner and the respondent entered into a consent in writing extending the period for assessment of income taxes for the year 1948 to June 30, 1953. Some part of the deficiency for each of the years 1945, 1946, 1947, 1948, and 1950 was due to fraud with intent to evade tax. The return for each of those years was false or fraudulent with intent to evade tax. Transferee Liability *69 On August 4, 1952 the respondent sent a letter to the petitioner Dorothy P. Millikin, advising her as follows: "There has been assessed against you as transferee of assets of M. S. Millikin a deficiency of $46,670.31 and $23,335.16 in penalty and $12,619.53 in interest for the taxable years ended December 31, 1945, December 31, 1946, December 31, 1947, December 31, 1948, and December 31, 1949, and there is proposed for assessment against you a deficiency of $23,474.05 and $11,737.03 in penalty, together with interest thereon as provided by law for the taxable years ended December 31, 1945, December 31, 1946, December 31, 1947, December 31, 1948, and December 31, 1949." The assessments referred to above were made on June 10, 1952 and those amounts were also the subject of jeopardy assessments against the petitioner M. S. Millikin. Opinion There can be no question that the respondent properly employed the net worth method in computing the taxable income of the petitioner for the years 1945 to 1949 and for both petitioners for the year 1950. Holland v. United States, 348 U.S. 121. When the agents of respondent investigated the petitioners only fragmentary records were shown to them; *70 so far as appears from the record, adequate records were not kept for all the activities of the petitioner; at least no such records were shown the agents or were produced at the hearing; the agents were shown bank statements and checks with respect to some of the bank accounts for some of the years, but were refused permission to see such records as to other bank accounts for the years 1945 through 1947; only one book was put into evidence; that was introduced by the respondent over objection of the petitioners, counsel stating that since the respondent went forward in this case on a net worth basis, he should be held to that method. Such book purports to show daily receipts and disbursements in connection with amusement machine operations in the year 1947, and contains a year-end entry purporting to show the results of operations in that year of some of the other businesses conducted. Although the petitioners claimed that they had kept the same type of record for the amusement machines for other years, they admitted that they did not have them in 1952 when the investigation was conducted. At the outset it should be noted that the respondent in making his net worth computation as *71 to the petitioner M. S. Millikin for the years 1945 to 1949, inclusive, has included some assets belonging to petitioner Dorothy P. Millikin, for which years joint returns were not filed and a joint deficiency notice was not issued. It is his contention that this is justified under the holding in William G. Lias, 24 T.C. 280, affirmed (C.A. 4), 235 F. 2d 879, certiorari denied 353 U.S. 935. However, in that case the taxpayer conducted his affairs and those of the family group in such manner as to make it impossible to identify the individual ownership of assets; furthermore, it appeared that all assets, in whatever name, in reality belonged to the taxpayer. In the instant case the petitioner Dorothy P. Millikin had a beauty salon business which she sold in 1946, and she owned some other assets. We are satisfied that, in the main, any assets which belonged to her can be identified. Accordingly, in our reconstruction of the net worth computation we have for the years 1945 to 1949, inclusive, included only those assets which belonged to the petitioner M. S. Millikin. The petitioners did not attempt to prove their taxable income from their books and records or by any other method, but *72 confined their efforts to attempting to show error in the respondent's net worth computation. The parties have agreed as to some of the items to be included in the net worth computation, namely, the laundry equipment, furniture and fixtures, premiums paid on life insurance, the amount of Federal income taxes paid and refunds received in the years in question and the amount of long-term capital gains. Nor is there any controversy as to the respondent's determination of non-deductible losses on trades of personal automobiles. They agreed that the respondent erred in including any amount for goodwill at the end of the years 1949 and 1950. Many of the items are in dispute. We have carefully considered the hundreds of pages of testimony and the scores of exhibits, and have made findings as to all items in order to reconstruct the net worth computation as set forth in our findings. We will discuss briefly hereinafter the principal items which are in dispute. Cash on Hand It is the contention of the petitioner that he had on hand at January 1, 1945, an amount of $40,000 in cash, and that this was the source of the funds used to purchase assets in 1945 and later years, particularly United *73 States Savings Bonds. This item is of prime importance, since we must determine with reasonable certainty the opening net worth to serve as a starting point for the calculation of increases in net worth. Holland v. United States, supra. The petitioner testified that he had always been able to save a little cash from year to year. He stated that he did not know how much he had at any particular time, except that by June, July or August 1944, he had accumulated $40,000; that he had kept this cash in a small safe in his home, in the form of 5, 10, and 20 dollar bills; that in June, July or August 1944, he and his wife counted the money and took it to the Federal Reserve Bank in Charlotte, North Carolina, and had it exchanged for larger bills. The petitioner Dorothy P. Millikin did not testify with respect to this cash. However, the petitioner did produce as a witness a teller of such bank who testified that he recalled that the petitioner came to the Federal Reserve Bank in Charlotte with a zipper bag of money of small denominations which was exchanged for 50 and 100 dollar bills; that he does not know exactly how much money was involved; that he estimates that the amount was at least *74 $30,000, since it took him 30 minutes or more to verify the money; that there was a regulation of the Treasury Department, promulgated in the spring of 1945, requiring banks to list the denominations of bills which they received and which they exchanged in transactions amounting to $1,000 or more; that the person was required to sign a form showing the denominations given in exchange; that at the end of each month it was the practice of the bank to tabulate these amounts; and that he did not know exactly when he exchanged this money for the petitioner, but that it was after January 19, 1942, and prior to 1948. We have no reason to doubt the truthfulness of this witness, and it may well be that an amount of $30,000 or more was changed by petitioner into larger denominations. However, the witness could not fix the date with any degree of accuracy. The transactions, from his testimony, could have occurred at any time from 1942 to the beginning of 1948. He stated that he did not know whether or not the bank had a record of the transaction. Another witness for the petitioner, an officer of the same bank, testified as to the requirement, commencing on May 21, 1945, that banks fill out a *75 form, TCR-1, recording exchanges of money from smaller denominations to 50 dollar bills or larger denominations if the transaction involved $1,000 or more. He stated that this form was a permanent bank record. However, he testified that he made an examination of the permanent records of his bank for the period from May 21, 1945, forward, and that he found no record of any exchange of currency by the petitioner. This testimony apparently was introduced for the purpose of proving that the transaction must have occurred at some time before May 21, 1945, since otherwise there would have been a record of the transaction. Despite this testimony, we are satisfied that the record does not support a finding that the petitioner could have had an amount of $40,000, or even $30,000, as of January 1, 1945. The evidence definitely indicates the contrary. In the first place, the agents checked for gifts and inheritances and found none, and the petitioner stated to the agents that he had received none; he filed no income tax return prior to 1940; he reported no taxable income in 1940 and 1941; he did not file a return in 1942; and 1943 and 1944 he paid Federal income taxes of only $1,362.91 and $858.53, *76 respectively. Furthermore, the history of the petitioner's business and financial operations prior to the years in question indicate that he could not have amassed any such amount of savings as he claims. Such history is set forth in our Findings of Fact. In his early working years he was a parttime railroad brakeman and carried on a dry cleaning business, which apparently became unprofitable in 1932 because of a decrease in dry cleaning prices. Later he was employed by a chain store at a relatively small salary; in 1933 he started a coin machine business at Hickory, which apparently was not highly successful since he relinquished that business in September 1941, selling the assets for a relatively small amount; he then engaged in an unsuccessful venture in a coin machine business in Georgia, returning to Hickory and resuming his coin machine business there in March 1942; at that time he also resumed working as a railroad brakeman, which he continued until April 1943. It is quite possible that in 1943 and later his music and pinball machine operations became more successful financially when he conducted some of such operations at Camp McCall and Fort Bragg, although his returns for *77 1943 and 1944 showed relatively small tax liabilities of $1,362.91 and $858.53, respectively. In view of the foregoing, we cannot conclude that the evidence concerning the exchange of money into larger denominations at the Federal Reserve Bank at Charlotte supports the claim that the petitioner had as much cash on hand at January 1, 1945, as claimed. It may be that the transaction occurred at some time subsequent to January 1, 1945, or that the bank teller is honestly mistaken in his estimate of the amount of money which was involved, or that not all of the money involved in the exchange belonged to the petitioner. However, the respondent has not, in his net worth computation, given the petitioner credit for any cash on hand at January 1, 1945. In this we think he was in error. We know that the petitioner was accustomed to making cash collections from his coin machine business and we also know that in July 1945, he purchased $15,000 face value of United States Savings Bonds in his name and that of his wife and two children, which would have cost about $11,250. The petitioner testified that, except for one year, all his purchases of bonds were by use of cash, as distinguished from *78 payment by check. He stated that he thought the year he used checks was in 1947. The revenue agent did not remember whether the bonds acquired in 1945 were acquired by cash or by check and stated that they might have been purchased by either means. He had previously testified at the criminal trial that the bonds purchased in 1946 and 1947 had been purchased by cash in the form of 10 and 20 dollar bills. In this state of the record, we think it logical to conclude that the petitioner used cash, at least to some substantial extent, in purchasing the bonds in July 1945. It is also logical to conclude, we believe, that the petitioner did at January 1, 1945, have a substantial amount of the cash which was used to purchase the bonds in July of that year. Exercising our best judgment, we have concluded and have found as a fact that he had cash at January 1, 1945, in an amount not greater than $6,000. Although the petitioner claims that the cash which he used in subsequent years to buy bonds was cash which he had on hand at January 1, 1945, we do not consider it reasonable to conclude that he would have kept large amounts of cash lying idle in a safe or a safe deposit box for such an extended *79 period of time. The respondent included in his computation no amount of cash on hand as of the end of the years 1945, 1946, and 1947. Here again the difficulty is in determining the amount. The evidence shows that in February 1946, the petitioner purchased additional United States Savings Bonds at a cost of $11,250 and that in November 1947, he bought a like amount of bonds. Since it appears that all or some of the bonds were purchased for cash, we think it only logical to conclude that some of the cash used was on hand as of the end of 1945 and 1946. Using our best judgment, we have concluded and have found that the petitioner had on hand at the end of the years 1945 and 1946 not less than $6,000 in cash, and have included this in our revision of the computation. The record does not afford any basis whatever for finding how much cash was on hand as of the end of 1947, and we therefore have not disturbed the respondent's determination that the petitioner had none at that time. The same is true of the respondent's determination of no cash as of the end of 1949. The respondent determined that the petitioner had cash at the end of 1948 and 1950 in the respective amounts of $3,500 and *80 $1,788. Upon the record, we cannot find that these determinations are erroneous. It may be added that the petitioners have not specifically questioned these latter determinations of the respondent. Cash in Banks The parties are in accord as to the yearend balances in the bank accounts in the name of each petitioner, in their joint names, in the names of the businesses, and in the names of the daughters. In his computations of net worth for all years, the respondent included the totals of all these bank accounts. There can be no question that the respondent properly included in the net worth as of the beginning and ending of 1950 the separate and joint accounts of the petitioners, since the computation for that year is a joint computation. Likewise, since the petitioner appears to have been the principal earner, we think it proper to conclude that any joint accounts in his name and the names of his wife and daughters were set up with his money, and were under his control. We have, therefore, included in his net worth at each year-end the amounts of all joint bank accounts with his wife and daughters. The petitioners are apparently in accord with this view since in their brief such *81 accounts are included. However, for the years 1945 to 1949 those accounts in the separate names of the petitioner Dorothy P. Millikin and the daughters have been eliminated. Stocks The parties agree that as of the end of 1948 and the beginning and end of each of the years 1949 and 1950, the petitioner had stock investments in Lincoln Shoe Stores and Hamlet Development Corporation which had cost $4,000. The respondent held that the petitioner had no investment in stocks as of the beginning and end of the years 1945 to 1947, inclusive. Although the parties did not stipulate that this holding of the respondent was correct, the petitioners do not specifically object to such determination, which was made as a result of an exhaustive investigation by the revenue agents and after interviews with the petitioners. In any event the petitioner has not shown that the determination was erroneous for the years 1945 to 1947, inclusive. The only specific controversy between the parties has to do with whether as of the end of 1950 there should be included in net worth 48 shares of preferred stock of Cotton Products, Inc. at a cost of $4,800. The respondent included such amount in net worth because *82 the petitioner and his accountant stated to the agent that they believed that the investment was made in 1950. The petitioners contend that this was error and that the investment was not made until 1951. There was introduced in evidence the stock certificate which indicates that the stock was issued on April 27, 1951. In their return for 1951 the petitioners claimed a long-term capital loss of $4,800 on account of worthlessness of this stock. Therein they showed that the date of acquisition was June 1951. We have concluded and found as a fact that the stock was purchased in 1951 rather than 1950. Accordingly, we have eliminated the item of $4,800 from net worth at the end of 1950. Receivables (Loans) The only dispute between the parties as to loans receivable relates to the amount as of the end of 1950. It is true that there was no specific agreement as to such receivables as of the beginning and end of the year 1945, but the petitioners do not contest the respondent's determination of zero as of those dates and there was no evidence to show error in the respondent's determination in that respect. The respondent included in net worth as of December 31, 1950, an amount of $7,000 as *83 representing an amount due the petitioner from Max Sawitz. The petitioner does not deny that there was an amount of approximately $7,000 owing to him from Sawitz, but contends that it was not an asset at the end of 1950; that the indebtedness did not come into existence until 1951. The revenue agent testified that during the investigation the petitioner told him that he had endorsed a note of Sawitz and that he believed that such note was foreclosed in 1950, resulting in a payment by him in that year of $11,550 because of his endorsement. Sawitz did not testify because he could not be located. However, it appears that this indebtedness and the petitioner's investment in Cotton Products, Inc., above referred to, were related transactions. Sawitz was the president and principal stockholder of Cotton Products Company. In their return for 1951 the petitioners showed that both the investment in the corporation and the receivable were acquired in June 1951. E. T. Bird, a realtor, testified that in January 1951, he issued a check for $2,000 to the petitioner as a loan and that this check was then endorsed by the petitioner and was deposited to the credit of Cotton Products, Inc. Although *84 the evidence is not as clear as might be desired, we believe that it establishes that this receivable, as well as the stock of Cotton Products, Inc., became an asset of the petitioner in 1951, and we have so found as a fact. Accordingly, in our reconstruction of the net worth computation we have eliminated this item from closing net worth of 1950. United States Savings Bonds At January 1, 1945, the only United States Savings Bonds owned by the petitioner were those he owned jointly with his wife, which had cost $131.25, and we have included that amount in our revision of the net worth computation. The petitioner continued to buy and accumulate bonds both in his own name and the joint names of himself and his wife and himself and his children. We think the evidence shows that these bonds must have been purchased with his funds. We also think it logical to conclude that he was a joint owner for the purpose of control of the bonds. Accordingly, we have included all these bonds at cost in his net worth computation throughout the years in question. He also bought bonds which were registered in the names of his wife and children and in the joint names of his wife and children. Strictly *85 speaking, the cost of these latter bonds should not be included in his net worth at the end of the various years, since he did not own them. However, both parties in their computations included these amounts, and we have likewise included them for the reason that in doing so the computation of income by the net worth method is not distorted. If the amounts so expended during the years in question for the bonds which constituted gifts to his wife and daughters were not included in his net worth, such amounts would properly constitute additions to the amounts of personal non-deductible expenditures which would be added to the increase in net worth each year. We have not included these amounts as a part of personal non-deductible expenditures in our recomputation. We note that the item for United States Savings Bonds is considerably lower after the close of 1948, indicating that a large portion of the bonds had been disposed of. The evidence does not show who actually owned those bonds as of the end of 1949 and 1950, but there seems to be no controversy between the parties as to this item for those years. In any event the petitioners have not shown error in the respondent's determination *86 in this respect. Investments Including Partnership Interests The parties are in accord as to the amount of petitioner's investments to be included in the net worth computation, except the amount at December 31, 1950. The evidence definitely establishes that the petitioner invested $3,256 in Sidney's Grill in 1950, but the petitioner would eliminate this investment as of the end of 1950, because the business was in receivership by the end of the year. However, we do not have any detailed proof as to the financial status of Sidney's Grill in 1950. There is no evidence at all that the receiver had sold any of the assets-in that year. Furthermore, we note that on their return for 1950, the petitioners did not claim a loss deduction on account of this investment. In this state of the record, we see no reason for eliminating this item as an asset as of the end of 1950, or allowing the deduction of any loss on account of this investment. The evidence establishes and we have found as a fact that the petitioner's investment in oil leases, to the extent of $2,097.42, became worthless in 1950. A witness who was also an investor in these same leases and who was one of the group charged with *87 the responsibility of exploiting the leases and making determinations as to whether further drilling should be done, testified that as to the particular leases in question the decision was made in 1950, after the drilling of the dry holes, that further drilling was not warranted, that the leases were abandoned and that no further drilling was done. Under these circumstances, the petitioner is entitled to a deduction in the amount of $2,097.42 under section 22(e) of the Internal Revenue Code of 1939, on account of worthlessness of the leases in 1950. See C. W. Carey, 6 B.T.A. 539, and J. H. McCallum, 14 B.T.A. 805. Accordingly, in our reconstruction of the net worth computation we have eliminated as an asset as of the end of 1950, the petitioner's oil investments to the extent of $2,097.42. This has the effect of the allowance of a deduction in that amount. Amusement Equipment The respondent did not include any amusement equipment in the petitioner's assets as of January 1, 1945 and December 31, 1945. The revenue agent testified that originally such equipment in the amount of $7,600 had been proposed for inclusion as of those dates, but that it was decided not to include these assets *88 because to do so would require the inclusion of a corresponding equal amount in the reserve for depreciation, since the assets were fully depreciated by January 1, 1945. He stated that therefore the exclusion did not adversely affect the petitioner's tax liability. While, strictly speaking, all assets should be included in opening net worth, we agree with the respondent that the exclusion under these circumstances does not adversely affect the petitioner's tax liability. For convenience, therefore, we have likewise excluded the equipment. We think it obvious from the record that the assets referred to are those which were the subject of transfer by petitioner to Kovachi in 1941 and retransfer to the petitioner in March 1942. Since they were second-hand machines when they were reacquired by the petitioner, we see no reason to question the respondent's determination that they were fully depreciated by January 1, 1945. We think it of some significance that the petitioner in his return for 1945 claimed no depreciation on amusement machines for that year. The respondent submitted both oral and documentary evidence, principally invoices, which establishes the purchase of substantially all *89 of the amusement equipment which he has included in the petitioner's assets for the years 1946 through 1950. We have accordingly accepted the respondent's figures as to cost of this equipment on hand, except in those instances where the evidence shows that certain machines were not actually owned by the petitioner, but were purchased for others or sold by the petitioner to others, or had been otherwise disposed of by tradeins on equipment, or otherwise. In 1946 the petitioner purchased a large amount of equipment. Included were 12 slot machines at a cost of $5,008.68 which the respondent included in the petitioner's assets as of the end of 1946. However, the evidence, including the testimony of two witnesses for the petitioner, Army officers who had previously been stationed at Fort Bragg, satisfies us that these machines were in reality purchased for recreational clubs at Fort Bragg and that they did not belong to the petitioner as of the end of 1946. The Army officers were uncertain as to the time of acquisition, stating that they thought the machines were acquired by the clubs in 1947. The record establishes to our satisfaction that the year was 1946. It appears that altogether *90 these clubs acquired at least 13 slot machines. The respondent's agents canvassed the sources of supply of coin operated machines and the respondent's list of purchases by the petitioner purports to be complete. We note that according to the respondent's list of purchases the petitioner purchased only one slot machine in 1947. Since one of the Army officers testified that all the new machines acquired by the clubs had paid for themselves by the latter part of 1947, it seems clear to us that the new machines which were acquired by the service clubs were the 12 which the respondent included in the petitioner's assets as of December 31, 1946, and the one purchased in February 1947 and included by respondent in petitioner's assets as of December 31, 1947. We have accordingly eliminated the cost of the 12 slot machines from the petitioner's net worth as of December 31, 1946, and subsequent years. It should be added that the testimony of the Army officers shows that the new machines were acquired in part by trading in old machines which had been previously purchased from the petitioner in 1946. This indicates that at some time in 1946 the petitioner owned and operated the old machines in *91 the military installations. However, neither party contends that these slot machines should be included among the petitioner's assets as of the beginning or end of 1945. In 1947 the petitioner bought additional equipment. The respondent determined that as of December 31, 1947, the petitioner had amusement equipment which had cost $19,644.20. The parties have agreed that there should be excluded items disposed of in the amount of $2,158.50. We have excluded the slot machines purchased in 1946 in the amount of $5,008.68, and also the slot machine purchased in February 1947, at a cost of $1,500, since the evidence fairly establishes that it also was purchased for Fort Bragg army clubs. The petitioner continued to buy equipment in 1948. The respondent held that as of the end of 1948 the petitioner had on hand amusement equipment which had cost $24,998.90. Included in the respondent's figure are 50 vending machines which had been purchased in 1948 at a cost of $787.96. The petitioner testified that he purchased those as an accommodation for another party who then refused to take them. He stated that he thereupon immediately sent them back to the seller. We accept this testimony of the *92 petitioner and have eliminated this item from his assets as of the end of 1948. The respondent also included at a total cost of $1,030, 100 vending machines which had been purchased in July or August 1948. These machines had been acquired by the petitioner and R. E. McDaniel and there was a balance of $1,000 owing on the purchase price. They determined that the venture would be unprofitable and the machines were disposed of in 1949 and the proceeds were used to pay, on June 19, 1949, the balance due. The petitioner in his requested reconstruction of the net worth calculation eliminates this item of $1,030 from assets. We likewise have eliminated this item from closing net worth of 1948 and opening net worth of 1949. This we have done for convenience, since if the item were included there would be an offsetting item in the amount of $1,000 to be included in Notes and Accounts Payable. The elimination thus does not distort the net worth computation. The petitioner in such reconstruction excluded a total of $1,204.34 which had been expended by him in that year for certain Pistol Gallery equipment. He does not contend that this equipment did not belong to him, but was apparently mistaken *93 as to the year in which it was purchased, since he includes this item in assets as of the close of 1949. It is clear that this equipment was purchased in 1948 and accordingly we have not disturbed the respondent's computation in this respect. The petitioner bought additional amusement equipment in 1949. The respondent determined that at December 31, 1949, the petitioner had amusement equipment which had cost $55,144.23. In addition to the eliminations necessary, as referred to hereinabove, the parties have agreed that musical equipment which had previously been acquired at a cost of $3,249.35 was disposed of in 1949 and should be eliminated from assets as of the close of 1949 and 1950. The parties have agreed that the cost of equipment from W. H. Richardson was $1,936.25, rather than $968.12, as held by the respondent. Proper adjustment has been made for this item in our reconstruction of the net worth computation for 1949 and 1950, including an increase in the depreciation reserve on account of this increased cost. The petitioner would have us eliminate an amount of $916.04, representing the cost of certain slot machines purchased in 1949. However, neither the petitioner's testimony *94 nor the record as a whole would justify eliminating the cost of these machines from the petitioner's net worth. The petitioner purchased additional amusement equipment during 1950. The respondent determined that he had on hand as of December 31, 1950, amusement equipment which had cost $75,239.84. Included in purchases of 1950 and in the respondent's figure are 18 slot machines. The petitioner concedes that he had 3 of these machines on hand as of the end of 1950, which had cost $792.36, but he denies having on hand the remainder. He testified that 7 of the machines which had been purchased from Heath Distributing Company at a total cost of $1,135, were not purchased by him. The petitioner stated that he had never bought any machines from Heath Distributing Company, although he was a customer of that company for replacement parts. It is the petitioner's contention that these machines must have been purchased by someone else in his name in order to get a dealer's lower price. The respondent introduced into evidence invoices covering these machines. These invoices show sales to M. S. Millikin at his post office box number in Hamlet, North Carolina, and to the Millikin Music Company, *95 Inc., at Hamlet, North Carolina. The former owner of the Heath Distributing Company testified that he did not know whether these were shipped by railway express or by truck. The sales were made c.o.d. and he could not state who paid for the machines. He did testify that in the ordinary course of his business the machines would be shipped to the purchaser as shown on the invoices. The invoices were not in his handwriting, but in the handwriting of the manager. This manager was not called as a witness. Upon the record, we are not satisfied that these machines were not obtained by the petitioner and we have accordingly made no adjustment to the respondent's determination in this respect. The remaining 8 slot machines purchased in 1950 were included by respondent in assets as of the end of 1950 at a total cost of $2,410.24. The petitioner testified that these were purchased for others or were sold by him to others. A representative of the VFW post at Hamlet, North Carolina, corroborated the petitioner, stating that in the latter part of 1950 the post bought from petitioner 2 slot machines at a cost of $623.65. A representative of the VFW post at Southern Pines, North Carolina, testified *96 that his organization purchased 3 slot machines in 1950 from the petitioner. A representative of the Richmond County Country Club testified that in 1950 the club bought 3 slot machines and a steel cabinet from the petitioner at a total cost of $1,000. The respondent on brief argues that there has not been a sufficient identification of these machines purchased by these organizations to show that they are the 8 above referred to which the respondent has included in petitioner's net worth. It is true that there was not positive identification, but we are satisfied from the whole record that they are the same machines. It appears that the respondent's agents canvassed all companies who sold this type of machine and included all sales which were recorded as having been made to the petitioner. We have eliminated from amusement equipment owned by the petitioner as of December 31, 1950, the 8 machines which the respondent had included at a cost of $2,410.24. Automobiles and Trucks The parties have stipulated the costs and dates of acquisition of various automobiles and trucks. The only difference between the parties is whether there should be included in petitioner's closing net worth for *97 1947, a 1947 Chevrolet which had cost $1,746.96. This car belonged to the petitioner Dorothy P. Millikin, and we have accordingly eliminated it from closing net worth of the petitioner for the year 1947. It may be added that in our recomputation we have restored to closing net worth of 1950 a 1948 Buick at a cost of $2,922.69 in accordance with the agreement of the parties that this car was not given as a wedding gift to one of the daughters, but remained the property of the petitioner at December 31, 1950. Real Estate There is no dispute between the parties as to the real estate or the cost thereof. The respondent included the cost of the residence at 208 Rockingham Road in the net worth of the petitioner as of the end of each of the years 1948 and 1949. However, the evidence shows that this property was owned by the petitioner Dorothy P. Millikin individually. We have accordingly excluded such item from the petitioner's closing net worth for 1948 and 1949, but have included it at original cost plus cost of improvements in the joint net worth as of the beginning and end of 1950. Notes and Accounts Payable There is no disagreement between the parties as to the amounts of notes and *98 accounts payable. However, in our reconstruction of the net worth computation we have eliminated from this item, as of the end of each of the years 1948 and 1949, the amounts of $9,749.25 and $8,657.95, respectively, representing liability to a building and loan association in connection with the residence at 208 Rockingham Road. Although the two petitioners were jointly liable on this obligation, we deem it proper to eliminate it from the petitioner's liabilities, since the property belonged to Dorothy P. Millikin, and we have excluded such property from the petitioner's assets. However, the amount of the obligation has been included among the joint liabilities of the two petitioners as of the beginning and end of 1950. Reserves for Depreciation Amusement Equipment. The respondent placed in evidence his detailed computation of the depreciation reserve for each year on amusement equipment. We have made several revisions in the respondent's determinations of cost of amusement equipment on hand as of the end of the years in question and this has necessitated a revision of the respondent's determined reserves for depreciation. The respondent computed depreciation at a rate of 20 percent. *99 The petitioner contends on brief that he should have computed depreciation at a rate of 25 percent. However, the petitioner submitted no evidence to show that the rate used by the respondent was erroneous. We have set forth in our Findings of Fact the proper figures to be used as the reserve for depreciation on this equipment as of each year-end. There is no dispute as to the reserves for depreciation of furniture and fixtures and automobiles and trucks. Laundry Equipment. The only dispute as to the reserve for depreciation of laundry equipment relates to the proper rate to be used. In his return the petitioner used a 5-year life for washing machines and the respondent also used a 5-year life in computing the deficiency. However, on miscellaneous laundry equipment the petitioner, in his return, used a composite 5-year life whereas the respondent computed depreciation at varying rates on the miscellaneous equipment by itemization. The petitioner did not introduce any evidence to show error in the respondent's determination of the useful life of the miscellaneous equipment and we accordingly approve the respondent's determination of the depreciation reserve on laundry equipment. Rental *100 Properties. In their returns and on brief the petitioners allocated a larger portion of the total cost of the rental properties to the improvements than did the respondent in determining the deficiencies. They also used a higher rate of depreciation. The respondent's determination is presumed to be correct and the burden of proof is upon the petitioners to show error in the computation. A realtor, witness for the petitioners, testified as to the type of construction and the age of the buildings and we have found the facts with respect thereto. However, he did not testify either as to the remaining useful life of the properties or as to the relative values of land and improvements. Upon the record we cannot conclude that the petitioners have shown that the respondent's determination was in error as to either allocation of cost as between land and buildings or as to the useful life of the properties. Personal Non-Deductible Living Expenses The respondent added to the increase in net worth of each year certain amounts as representing personal non-deductible living expenses. These varied greatly from year to year, being $10,079.52 for 1945, $14,037.88 for 1946, $19,522.20 for 1947, $9,432.96 *101 for 1948, $17,560.92 for 1949, and $8,118.66 for 1950. This determination was made in large part upon the basis of unidentified checks shown on bank records. We think the respondent was not justified in assuming that all these amounts constituted non-deductible personal or living expenses. Some of these amounts may be reflected in assets or other items included in the net worth computation. Furthermore, it is not logical to conclude that the living expenses fluctuated so drastically as the respondent's determination would indicate. The petitioner testified that the living expenses would amount to only $2,000 or $3,000 per year. We think it clear that the expenditures must have been in excess of this estimate. Under the circumstances, we have been forced to exercise our best judgment and estimate from such evidence as was presented the amount which should be added to the increase in net worth each year on account of non-deductible personal and living expenses (exclusive of insurance premiums and Federal income taxes). We have concluded and have found as a fact that such expenditures amounted to $4,000 in each of the years 1945, 1946, and 1947. For the years 1948, 1949, and 1950, we *102 believe that there were greater expenditures due to the fact that the petitioners then operated at least two automobiles which were more expensive than those previously used, they moved into a larger home, and their daughters were attending college or business school. In addition, improvements were made to the residence at 208 Rockingham Road in 1949 at a cost of $3,261.77, and this is not reflected in any asset in petitioner's net worth as of the end of that year. If these improvements were paid for by the petitioner, a proper computation of his taxable income by the net worth method would require that this amount be added to the increase in his net worth for 1949. Likewise, there should be reflected in his net income computed by the net worth method in 1948 and 1949, the non-deductible portions of any amounts which he may have paid in those years on the mortgage on the property. It is admitted on brief that the petitioner made some of these payments and paid for some of the improvements. We have concluded and found as a fact that all these expenditures were made by the petitioner. The petitioner Dorothy P. Millikin testified that she made the down payment of $4,750 on the house *103 out of her life's savings and out of some undisclosed amount which her father had given her. We accept this as being the fact. We know that she must have had some cash of her own, since she had sold her beauty shop in 1946 for $3,750. However, the evidence as a whole indicates that in those years she was not earning income and the status of her bank accounts indicates that she did not have funds sufficient to have made additional payments. Furthermore, since this property was used as the family residence, and the petitioner was jointly liable for the payments, it seems quite logical that the petitioner would have made them. Accordingly, in arriving at our conclusion as to the amounts of petitioner's non-deductible personal and living expenses for the years 1948 and 1949, we have recognized that the expenditures for improvements to the house and some portion of the mortgage payments constituted non-deductible expenditures. For 1950 the non-deductible portion of the mortgage payments is already reflected in the increase in net worth through the decrease, as of the end of 1950, of the amount of the outstanding mortgage. The respondent in his net worth computation had included as a personal *104 non-deductible living expense a Buick automobile which had cost $2,922.69 on the ground that this was a wedding present by petitioner to his daughter who was married in 1950. At the hearing the parties agreed that this automobile was not given to the daughter, but remained an asset of the petitioner and that it should be included among assets of petitioner on hand as of the end of 1950. Reflecting the above conclusions, we have found that the non-deductible personal and living expenses amounted to $5,000 in 1948, $9,000 in 1949, and $5,000 in 1950. Deficiencies in Tax Giving effect to the necessary corrections in the respondent's net worth computation and adding to the increase in net worth for each year only the non-deductible personal or living expenditures, we have computed the net income to be as set forth below, in comparison with the net income reported by the petitioners: Corrected
Net
Net
Income Per
Year
Income
Returns
1945
$18,677.08
$ 1,675.35 (adjusted gross)
1946
41,088.98
13,242.71
1947
23,417.05
3,763.21
1948
16,459.66
(7,320.01)
1949
(1,486.90)
3,012.31
1950
13,703.86
5,283.32 There are, therefore, deficiencies in tax for each of the years except 1949. Additions to Tax on Account of Fraud *105 The respondent added to the deficiencies determined by him 50 per cent thereof pursuant to section 293(b) of the Internal Revenue Code of 1939, [2] on the ground that some part of each deficiency was due to fraud with intent to evade tax. Section 1112 of the Internal Revenue Code of 1939[3] *106 imposes the burden of proof upon the respondent in respect of the fraud issue. Fraud is never presumed, but must be established by clear and convincing evidence. Drieborg v. Commissioner (C.A. 6), 225 F.2d 216; Kashat v. Commissioner, (C.A. 6), 229 F. 2d 282; Arlette Coat Co., 14 T.C. 751; Frank Imburgia, 22 T.C. 1002; and W. A. Shaw, 27 T.C. 561, affd. (C.A. 6), 252 F. 2d 681. It is well established that a taxpayer's consistent and substantial understatement of income over a period of years may constitute clear and convincing evidence of fraud. Holland v. United States, supra; Kashat v. Commissioner, supra; Rogers v. Commissioner (C.A. 6), 111 F. 2d 987; Drieborg v. Commissioner, supra; Kurnick v. Commissioner (C.A. 6), 232 F. 2d 678; Epstein v. United States (C.A. 6), 246 F. 2d 563, certiorari denied 355 U.S. 868; Jack M. Chesbro, 21 T.C. 123, affd. (C.A. 2), 225 F. 2d 674, certiorari denied 350 U.S. 995; Arlette Coat Co., supra; and W. A. Shaw, supra. In Epstein v. United States, supra, the court stated: "* * * The consistent understatement of large amounts of income for a number of years is evidence of willful intent to evade. Kurnick v. Commissioner, supra, 232 F.2d 681; Drieborg v. Commissioner of Internal Revenue, 6 Cir., 225 F. 2d 216. In Holland v. United States, supra, 348 U.S. 139, * * * the Supreme Court declared that 'evidence of a consistent pattern of underreporting large amounts of income' will support 'an inference of willfulness.'" In Schwarzkopf v. Commissioner (C.A. 3), 246 F. 2d 731, *107 the court stated that even though the usual indicia of fraud are absent the consistent failure to report substantial amounts of income over a number of years standing alone is effective evidence of fraudulent intent. See also to the same effect, Shahadi v. Commissioner (C.A. 3), 266 F. 2d 495. In the instant case the correct net income for each of the years in question, except 1949, was many times the amount reported by the petitioners. In addition, the petitioners did not keep accurate records of all the business enterprises; operations were carried on to a substantial extent by the use of cash without maintaining a record thereof; and the petitioners denied the examining agents permission to examine some records which were maintained. It is of some significance also that the petitioner was indicted and convicted of attempting to evade his income taxes for the years 1947 and 1948 by filing false and fraudulent returns for those years. See Eugene Vassallo, 23 T.C. 656, Abraham Galant, 26 T.C. 354, and Madeline V. Smith, 32 T.C. - (July 30, 1959). The record clearly and convincingly shows, and we have concluded and found as a fact, that some part of the deficiency for each of the *108 years 1945, 1946, 1947, 1948, and 1950 was due to fraud with intent to evade tax. Substantially all of the items in the net worth computation, as we have reconstructed it, were established by stipulations or agreements of the parties or by affirmative proof. Only to a very minor degree is the reconstruction based upon a presumption of correctness of the respondent's determination. In concluding and finding that some part of each deficiency is due to fraud with intent to evade tax, we have not relied to any extent upon any presumption in favor of the correctness of the respondent's determination. Since the petitioner did not understate his income for the year 1949, there is, of course, no deficiency and no addition to tax under section 293(b) for that year. Statute of Limitations The pleadings raise the issue of the statute of limitations in respect to the years 1945, 1946, 1947, and 1948. We have held that the return for each of those years was false or fraudulent with intent to evade tax, and it follows that under section 276(a) of the Internal Revenue Code of 1939, [4] assessment and collection of the tax and additions for those years are not barred by the statute of limitations. *109 Additions to Tax Under Secs. 294(d)(1)(A) and 294(d)(2) For the year 1950 the respondent determined additions to tax under section 294(d)(1)(A) and section 294(d)(2) of the Internal Revenue Code of 1939, for failure to file a declaration of estimated tax and for substantial underestimation of estimated tax. No evidence whatsoever was introduced by the petitioners in this respect and the respondent's determination that such additions are to be made is approved. Additions to tax properly may be determined under both sections, and in the case of a failure to file a declaration it is deemed that there has been a zero estimate. See G. E. Fuller, 20 T.C. 308, affirmed on other issues (C.A. 10), 213 F. 2d 102; Patchen v. Commissioner (C.A. 5), 258 F. 2d 544, affirming on this issue 27 T.C. 592; Hansen v. Commissioner (C.A. 9), 258 F. 2d 585, affirming on this issue a Memorandum Opinion of this Court [16 TCM 471, T.C. Memo. 1957-113]; *110 and Abbott v. Commissioner (C.A. 3), 258 F. 2d 537, affirming 28 T.C. 795. But cf. Acker v. Commissioner, (C.A. 6), 258 F. 2d 568, reversing a Memorandum Opinion of this Court [16 TCM 89, T.C. Memo. 1957-17], certiorari granted 358 U.S. 940. Transferee Liability There remains for consideration the question of whether the petitioner Dorothy P. Millikin is liable as a transferee of assets of the petitioner M. S. Millikin for deficiencies and additions thereto (plus interest) owing from the petitioner M. S. Millikin for the years 1945 through 1948. Section 311, Internal Revenue Code of 1939. [5] *111 The burden of proof is upon the respondent to show that the petitioner is liable as a transferee. Section 1119(a), Internal Revenue Code of 1939. The respondent determined that Dorothy P. Millikin is liable for the full amount of tax liabilities, and interest thereon, of her husband for those years. However, on brief the total amount or value of transfers which he alleges to have been made by the petitioner to his wife is far less than the total of such liabilities of the petitioner. It is the position of the respondent that at all times after 1947 the petitioner was insolvent and that any transfers made thereafter rendered Dorothy P. Millikin liable as transferee. The transfers which the respondent claims were made consisted of the following: in 1948, the purchase of an apartment house for $11,500 in the names of both petitioners, the purchase of another apartment in both names for $7,650, *112 certain deposits in Dorothy P. Millikin's bank account totaling $4,292.50, down payment of $750 on the purchase of a residence, mortgage payments on such residence of $300; in 1949, deposits to her bank account in the amount of $1,084.50, mortgage payments on the residence in the amount of $1,650, remodeling expenses on the residence of $3,261.77; in 1950, deposits to her bank account totaling $2,246.88, improvements to the residence of $238.23, mortgage payments on the residence of $1,800; in 1951, down payment of $1,000 on the purchase in the two names of property on Front Street, Hamlet, mortgage payments on the residence of $1,800; and in 1952 to 1955, inclusive, mortgage payments on the residence in the amounts of $1,500, $2,100, $1,800, and $1,260.4[*] respectively. On brief the petitioners admit certain payments by M. S. Millikin, namely, the payments for the two apartment buildings in 1948, mortgage payments of $1,650 and remodeling expenses of $700 in 1949, payments in 1950 of $750 on the mortgage and $238.35 on remodeling, mortgage payments of $1,350 and payment of $1,000 for a lot in the two names in 1951, and payments on the mortgage of $750 in 1952, $2,100 in 1953, $1,800 *113 in 1954, and $1,260.49 in 1955. Thus the respondent contends that there were transfers totaling $44,234.37. Of this amount the petitioners admit payments by M. S. Millikin of $30,748.84, although contending that the purchases of the three properties as tenants by the entireties did not constitute transfers, and also contending that the respondent has not met his burden of showing that any of the transfers were without consideration. We have not found it necessary to make precise findings as to transfers made, since for other reasons we think the respondent has not met his burden of proving transferee liability. The existence and extent of transferee liability is to be determined by state law. Commissioner v. Stern, 357 U.S. 39. Under the statutes and authorities of the State of North Carolina, a conveyance is valid, even though without consideration, if the transferor retains property fully sufficient and available to pay his debts then existing and there is no actual intent to defraud; if the transferor does not retain property fully sufficient and available to pay his debts then existing, the transfer is invalid as to creditors; if the transfer is made with the actual intent upon *114 the part of the transferor to defraud creditors, it is void, even though property fully sufficient and available to pay then existing debts is retained. See Aman v. Waller, 165 N.C. 224, 81 S.E. 162, and Michael v. Moore, 157 N.C. 462, 37 S.E. 104. The pattern of claimed transfers as described hereinabove does not indicate a deliberate attempt or intent to defraud creditors. While the purchases of property by the petitioner in the joint names of himself and his wife as tenants by the entireties are, of course, subject to particular scrutiny, there is no evidence whatever to show that these purchases were made with intent to defraud creditors. See Finch v. Cecil, 170 N.C. 114, 86 S.E. 991. The respondent's principal contention is that although the petitioner had substantial assets at all times, he was insolvent at the times the transfers were made, in view of the large deficiencies in tax and additions thereto, plus interest. See Robert Leslie Bowlin, 31 T.C. 188, on appeal (C.A. 6). Under his burden of proof it was incumbent upon the respondent to show the value of assets of the transferor at the times of claimed transfers in order to determine whether the petitioner was insolvent *115 or was rendered insolvent. See Arlington F. Brown, 24 T.C. 256, and Ruth Halle Rowen, 18 T.C. 874, reversed on another issue (C.A. 2), 215 F. 2d 641. See also Flowers v. American Agricultural Chemical Co., 199 N.C. 456, 154 S.E. 736. The respondent has not met this burden of showing the value of the petitioner's assets as of the times of the various claimed transfers or as of the time of the notification of transferee liability, August 4, 1952. For purposes of showing insolvency the respondent introduced a schedule of comparative balance sheets in which assets are listed as of the various year-ends at cost. To a large extent this exhibit is based upon his computation of net worth used in determining the petitioner's tax liability. It is projected, however, through the year 1955. The only liabilities shown in this schedule, aside from the tax liabilities, are notes and accounts receivable in relatively insubstantial amounts. In such schedule, in computing the net worth, assets are offset by relatively large reserves for depreciation of equipment and rental properties. These, of course, are not liabilities but are bookkeeping entries. It is true that such reserves do reflect the *116 depreciation sustained upon the assets but the difference between cost and depreciation sustained does not necessarily establish the value of the assets. It may well be that the value of the assets listed would be less than the costs which are shown, but in determining whether there is insolvency we do not feel justified in speculating as to the value of the assets as of the times of transfer. In such schedule the respondent includes the petitioner's tax liabilities, including additions and interest, at amounts greater than will result from the recomputation under our Opinion hereinabove. Thus, even though there be excluded from the petitioner's assets as found by us any properties held by the two petitioners as tenants by the entireties (and this deletion was made by the respondent in his schedule), we still are unable to determine as of any particular time that the liabilities of the petitioner exceeded the value of his assets. Furthermore, in the absence of evidence of the value of the transferor's assets at the time of the respondent's determination of the transferee liability, we would not be able to determine the extent of the transferee's liability since such liability may *117 not exceed the difference between the transferor's liability and his vulnerable assets on hand at that time. See Healy v. Commissioner, 345 U.S. 278, Arlington F. Brown, supra, and Terrace Corporation, 37 B.T.A. 263. In view of the foregoing, we are constrained to the view that the respondent has not met his burden of proof as to the transferee liability. It may be further observed that this question of transferee liability may to some extent be moot in view of the fact that there will be a substantial joint liability for the year 1950, for the collection of which any assets separately owned by the petitioner Dorothy P. Millikin or by both petitioners jointly would be available. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Dorothy P. Millikin, Docket No. 45050, and M. S. Millikin and Dorothy P. Millikin, Docket No. 45052.↩
*. Adjusted gross income. Tax taken from the table.↩
2. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2).↩
3. SEC. 1112. BURDEN OF PROOF IN FRAUD CASES. In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Commissioner.
4. SEC. 276. (a) False Return or No Return. - In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.↩
5. SEC. 311. TRANSFERRED ASSETS. (a) Method of Collection. - The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, collected, and paid in the same manner and subject to the same provisions and limitations as in the case of a deficiency in a tax imposed by this chapter (including the provisions in case of delinquency in payment after notice and demand, the provisions authorizing distraint and proceedings in court for collection, and the provisions prohibiting claims and suits for refunds): (1) Transferees. - The liability, at law or in equity, of a transferee of property of a taxpayer, in respect of the tax (including interest, additional amounts, and additions to the tax provided by law) imposed upon the taxpayer by this chapter. * * *
Any such liability may be either as to the amount of tax shown on the return or as to any deficiency in tax.↩